**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JOHN L. HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv115 |
| | ) | |
| GALBERTH SADIE,[1] et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment" (Docket Entry 52) (the "Motion") filed by Sadie Ferguson ("Nurse Ferguson"), Jerry Ingram, Jr. (at times, "Unit Manager Ingram"), Michael Johnston (at times, "Sgt. Johnston"), and Heather Sullivan (individually, "Nurse Sullivan," and collectively, the "Defendants"). For the reasons that follow, the Court should grant in part and deny in part the Motion.

## BACKGROUND

Pursuant to 42 U.S.C. § 1983, John L. Hicks (the "Plaintiff"), an inmate with the North Carolina Department of Public Safety (the "NCDPS") sued Defendants for allegedly violating his rights in connection with an incident at Scotland Correctional Institution ("Scotland Correctional" or "Scotland CI") on the night of January

---

1 The complaints in this matter misidentify "Sadie Ferguson" as "Galberth Sadie." (See Docket Entry 24 at 1.) [Docket Entry page citations utilize the CM/ECF footer's pagination.]

22, 2016.  (See, e.g., Docket Entry 2 (the "Verified Complaint") at 1-27; Docket Entry 22 (the "Verified Amended Complaint") at 1-27.) Defendants moved for summary judgment, asserting that "there exists no genuine issues of material fact which support Plaintiff's claims of alleged violations of his constitutional rights by Defendants." (Docket Entry 52 at 1; see also Docket Entry 53 (Memorandum in Support); Docket Entry 53-1 (affidavit of Defendants' counsel and attached records); Docket Entry 53-2 (Declaration of Nurse Sullivan); Docket Entry 53-3 (Declaration of Sgt. Johnston); Docket Entry 53-4 (Declaration of Unit Manager Ingram).)  Plaintiff filed a verified response in opposition to the Motion (Docket Entry 59) (the "Response"), asserting that "there is a real dispute here as to facts" and that "a jury could decide in favor of Plaintiff's claim[s]."  (Id. at 1.)[2]  Defendants replied to the Response.  (See Docket Entry 60.)

As relevant to the Motion,[3] the record reflects the following:

_____

2  For legibility reasons, this Opinion uses standardized capitalization, punctuation, and spelling in all quotations from the parties' materials.

3  In his Verified Complaint and Verified Amended Complaint, Plaintiff includes allegations against various Scotland Correctional staff who do not currently appear as defendants in this action.  (See, e.g., Text Recommendation dated July 10, 2020 (explaining that Verified Amended Complaint "purports to add seven more Defendants" and recommending that Court permit Plaintiff's claims to proceed against Lt. Ferguson and Officer Harrington, but not "Moore, Jones, Torrex, D. Bullard, and P. Jacobs"); Docket Entry 40 at 1 (adopting Text Recommendation and dismissing "any claims in the [Verified] Amended Complaint against Defendants (continued...)

2

## I. Plaintiff's Verified Complaints

At approximately 8:45 p.m. on January 22, 2016, Plaintiff assaulted two female Scotland Correctional officers. (See Docket Entry 2 at 4.) In response to this assault, Officer Ferguson administered O.C. Pepper Spray into Plaintiff's face and Plaintiff "submitted to the handcuffs without causing [Scotland Correctional] staff members any more problems." (Id. at 5.)[4] Following Plaintiff's handcuffing, Scotland Correctional staff, including Officer Harrington, escorted Plaintiff "out of C-Block Dormitory and . . . into the main hallway." (Docket Entry 22 at 9.) Lt.

_____

3(...continued)
Moore, Jones, Torrex, D. Bullard, and P. Jacobs"); Docket Entries 41, 43 (Lt. Ferguson's and Officer Harrington's motions to dismiss); Docket Entries 47, 48 (Plaintiff's motions to withdraw Lt. Ferguson and Officer Harrington from complaint); Text Orders dated Dec. 29, 2020 (deeming Plaintiff's motions to withdraw as notices of dismissal without prejudice of Officer Harrington and Lt. Ferguson pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i)).) Accordingly, this Opinion addresses neither extraneous allegations in Plaintiff's materials regarding those individuals nor arguments in Defendants' memoranda in support of the Motion that seek summary judgment in favor of Lt. Ferguson and Officer Harrington.

4 Defendants attempted to submit a video of this altercation on a USB drive in support of their Motion. (See Docket Entry 53-1 at 15; Docket Entry 53 at 3-4 (describing video); Docket Entry 56 at 1 (granting Defendants' request to "manually file the USB drive with the Clerk of Court").) However, the "Incident of 01222016 IR 4860-16-55 Blue C block122160835.exe" file on the submitted USB drive does not function, preventing the Court from reviewing the submitted video. As the video does not purport to capture any of the incidents involving Defendants' interactions with Plaintiff (see, e.g., Docket Entry 53 at 4 (admitting that Officer Ferguson "escorted Plaintiff out of camera view" prior to transferring him to Sgt. Johnston's custody)), the inaccessibility of the submitted video file does not affect resolution of the Motion.

3

Ferguson then instructed Officer Harrington and the other officer escorting Plaintiff "to stop for [a] minute," by which point additional officers, including Sgt. Johnston, had arrived "from Gray Unit Segregation." (Id. at 10; see also Docket Entry 53-3, ¶ 3 (averring that, after hearing "a call for assistance on the radio," Sgt. Johnston "reported to the Blue Unit to find that [Plaintiff] had been restrained after assaulting two female staff members").) After a private consultation with Lt. Ferguson, Sgt. Johnston informed the other officers that he "was going to escort[ Plaintiff] to Inmate Receiving from [t]here" (Docket Entry 22 at 11). (See id. at 10-11; see also Docket Entry 53-3, ¶ 3 (averring that "[Sgt. Johnston] and Officer Harrington escorted [Plaintiff] to Receiving").)

NCDPS policies and procedures for handling inmates following altercations state that "[t]he inmate is to be secure[d] with as little force as possible, no more than what[ i]s needed to get the inmate secure." (Docket Entry 22 at 11.) After "the inmate is secure in handcuffs the [Officer-In-Charge is] to take photographs of the inmate to record any injuries" and the "inmate is to then be taken to the nurses' station to be screened for injuries and mental health issues." (Id.) "If the inmate was mace[d] and not decontaminated by medical, the inmate is to be taken and decontaminated [in] the nearest facilities" and then "taken to a cell and the process [is] to begin." (Id.)

4

"Once [Sgt.] Johnston applied the escorted maneuver on [Plaintiff, Sgt.] Johnston began to apply pressure to [Plaintiff's] arm while saying so you like to assault female staff members huh[,] which shows the premeditated a[nd] malicious and sadistic intent of revenge." (Id. at 11-12.) As Sgt. Johnston and Officer Harrington escorted Plaintiff to Inmate Receiving, "they kept pushing their weight down on [Plaintiff], making it difficult for [him] to walk adequately." (Id. at 12.) During his escort to Inmate Receiving, Plaintiff engaged in "no resistence []or combative behavior . . . so this act[ion] was unnecessary and further shows the further intent" (id.) to take revenge against Plaintiff for assaulting the female Scotland Correctional officers (see id. at 10-12). NCDPS policies and procedures "state that all inmate[s] are to be escorted with reasonable a[nd] soft touch not aggressively . . . unless the inmate is being combative and lash[es] out at the [officer] or sadistic intent." (Id. at 12.)

As Officer Harrington and Sgt. Johnston escorted Plaintiff to Inmate Receiving, Plaintiff informed them "that it was difficult for [Plaintiff] to breathe due to being spray[ed] with O.C. Pepper Spray in [his] face . . . and that [he] suffer[s] from asthma." (Id. at 13.) When they arrived at Inmate Receiving, Sgt. Johnston and Officer Harrington escorted Plaintiff "further into Inmate Receiving with [his] head down and slumped over in front of the shower stall door where [they] stopped." (Id.) Sgt. Johnston and

5

Officer Harrington "made it appear [as] if they w[ere] going to allow [Plaintiff] the opportunity to decontaminate[] from being O.C. Pepper Sprayed by Officer Ferguson." (Id.)  However, Officer Harrington and Sgt. Johnston "position[ed Plaintiff] out [of] the line of the camera into a blind spot[] in [the] Inmate Receiving area." (Id.; see also Docket Entry 2 at 10 (same).)  "[A]ll of [a] sudden, [Plaintiff] was brutally and viciously assaulted by [Sgt.] Johnston, who struck [Plaintiff] in [his] head and face area above [his] upper right eye with some type of foreign object[5] that caused [Plaintiff] to feel a sharp pain to the right side of [his] head and face." (Docket Entry 22 at 12.)

This blow rendered Plaintiff "unconscious with a concussion." (Id. at 27; see also id. at 14 (asserting that Plaintiff "began to go unconscious from the blow to [his] head by [Sgt.] Johnston").) "When [Plaintiff] started to regain [his] consciousness[, he] noticed a big pool of blood in front of [him, as his] right eye was busted completely wide open with a large laceration over the right eyebrow." (Id. at 14.)  Plaintiff's "right eye was pushed completely into his skull causing the side walls and the floor of his inner right eye to be completely destroyed from the damage of being struck in the face and the head area." (Id. at 28; accord id. at 27 (describing injury as "his right eye being pushed

_____

5 Plaintiff "presum[es]" that Sgt. Johnston used "a baton" to strike him.  (Docket Entry 22 at 27.)

6

completely into his skull causing the side walls and the floor of
his inner right eye to be completely destroyed").)  In addition,
"[t]he blood valve [sic] and vein in his face was broken and there
was swelling around the base of the outer eye and discoloration."
(Id. at 28.)  Plaintiff's pants and tennis shoes were also "removed
from [his] body without [his] permission." (Id. at 14.)  Plaintiff
asked Sgt. Johnston where his pants and tennis shoes were, but Sgt.
Johnston refused to answer any of Plaintiff's questions about his
pants and tennis shoes. (Id.)  Plaintiff told Sgt. Johnston and
Officer Harrington that he "could not breathe," but they ignored
his "cry for help, which also violated" NCDPS policies regarding
"giving medical screening after the use of force." (Id.)  Someone
else in the room behind Plaintiff said "that if you[, Plaintiff],
can talk then you[, Plaintiff], can breathe." (Id. at 15.)

Officer Harrington and Sgt. Johnston then escorted Plaintiff
"down [the] main hallway to Segregation half naked." (Id.)  "Upon
arriving at Segregation," Officer Harrington, Lt. Ferguson, and
Sgt. Johnston "placed [Plaintiff] into [a] cell without being
decontaminated from being sprayed with O.C. Pepper Spray." (Id.)[6]

---

[6] When Officer Harrington, Sgt. Johnston, and Lt. Ferguson
"started to walk[] away from [Plaintiff's] cell door," Plaintiff
started kicking and banging on his cell door to get their attention
before they left without "giving [him his] medical treatment for
injuries" (Docket Entry 2 at 13), but Lt. Ferguson threatened that
he "was going to give [Plaintiff] something to really need medical
treatment for if" Plaintiff did not sit down and stop kicking and
banging his cell door (id. at 14).  Plaintiff unhappily complied
(continued...)

"After being placed in Segregation[, Plaintiff] was put into a cell without property []or bare necessity such as [a] bed roll, mattress, clothes, []or hygiene items, only in possession of the boxer briefs that [he] was wearing without being decontaminated or medically screened." (Id. at 16.) Two days later, a Scotland Correctional captain took pictures of Plaintiff "for the injuries incident report[]," although waiting two days to take those pictures violated NCDPS policy. (Id.)

Plaintiff requested medical treatment for his injuries, which caused him pain, multiple times from this captain, as well as everyone he "came in contact with" (id. at 17), but he "was repeatedly ignored and denied" (id.) even though he requested medical attention "every day after the incident" (id.). (See id. at 16-19.) Plaintiff "was taken out of [his] cell" (id. at 19) in the "Red Unit Segregation" (id. at 18) "approximately five or six times," including "once for a foot soak, once for dental, and [twice] for [his] write up to be served on [him, and] once to see the unit manager[, name unknown,] about the mistreatment that [he] was receiving on her unit" (id. at 19). "During this time, [Plaintiff] asked for medical care, shower[s], a mattress, hygiene items, sleep, exercise, and the basic necessities to function day to day as a[] . . . human being[, but] was ignore[d] and denied."

<hr>

6(...continued)
with that directive.  (Id.)

(Id.)  On March 8, 2016, Sgt. Jacobs agreed to escort Plaintiff to the nurse station, but Plaintiff had to first borrow a pair of pants to wear to the medical station.  (Id. at 19-20.)  Plaintiff informed Sgt. Jacobs that he "ha[dn]'t had any clothes over 23 days or treatment for [his] injuries."  (Id. at 20.)

When Plaintiff arrived at the nurse station for examination, Nurse Moore asked him "what the emergency was" and Plaintiff explained that he "was involved in a misuse of force."  (Id.) Nurse Moore looked at Plaintiff "in disbelief and began to look into the digital files on the computer so that Nurse Evonne S. Moore could find verification to see whether or not what [Plaintiff] was saying was true."  (Id.)  "Once Nurse Evonne S. Moore found the information that confirmed that what" (id.) Plaintiff "was saying was indeed true" (Docket Entry 2 at 19), Plaintiff "could audibly hear Nurse Evonne S. Moore under her breath say 'Oh my God'" (Docket Entry 22 at 20 (emphasis in original)).  "In the computer Nurse Evonne S. Moore found notes that [Nurse] Sullivan, along with [Nurse Ferguson], nurses at Scotland Correctional, had taken documenting [Plaintiff's] vital signs without completing examination form but making a note that stated, unavailable, unconscious, which shows the lack of adequate

medical attention [and] the denial of medical attention in itself."
(Id.)[7]

Lt. Ferguson influenced Nurse Sullivan and Nurse Ferguson "not to provide [Plaintiff] with any medical care for [his] injuries out of retaliation to teach [Plaintiff] a lesson about putting [his] hands on [Lt. Ferguson's] fellow co-workers." (Docket Entry 2 at 28.) Nurse Sullivan and Nurse Ferguson "denied [Plaintiff] the right to be treated for [his] injuries that resulted from the misuse of force that was applied on [him] by [Sgt.] Johnston as a form of punishment, thus acting recklessly in failing to provid[e] medical care to [Plaintiff]." (Id.)

"After realizing that the initial examination had been done incorrectly, Nurse Evonne S. Moore first did a correct examination." (Docket Entry 22 at 21.) She then gave Plaintiff "ibuprofen for the pain on [the] right side of [his] face as well as [his] left shoulder and left knee and [told him] to rest." (Id.) Nurse Moore also requested x-rays for the right side of Plaintiff's face, his left shoulder, and his left knee "to rule out any torn ligaments or tissue damage." (Id.) The order for those x-rays "was approved" (id.), but when Plaintiff "was finally taken

---

7 In his step-one response to Plaintiff's grievance regarding this incident, Unit Manager Ingram "stated that on January 22, 2016, [Plaintiff] was examined by Nurse Moore for injuries on the day of the assault, when in fact that is not true. Nurse Moore examined [Plaintiff] on [March 8, 2016,] a month and a half after the assault and [Plaintiff] ha[s] the medical report[] to prove it." (Docket Entry 2 at 29.)

to be x-rayed, the only thing that was x-rayed was [his] shoulder" (id. at 22). The failure to x-ray "the right side of [Plaintiff's] face and left knee is inexcusable because the x-ray for the specified area[s] was order[ed] and [Nurse Moore, who] is the one that ordered the x-rays was told exactly what was wrong with [Plaintiff]." (Id.) "The process of being examined and treated took several more months" (id.), but ultimately, after his transfer from Scotland Correctional to Polk Correctional Institution, Plaintiff obtained a consultation with Dr. Blakey, a doctor at UNC Hospital (Docket Entry 2 at 21-22).

During his first consultation with Dr. Blakey, Plaintiff "was . . . asked to explain [his] injuries and what happened to [him]." (Docket Entry 22 at 22.) Plaintiff informed Dr. Blakey that he "was assaulted by [Sgt.] Johnston in retaliation for a prior incident in which [Plaintiff] was involved in an altercation with two of [Sgt. Johnston's] fellow female co-workers." (Id. at 23.) Plaintiff told Dr. Blakey that he "was struck in the eye and facial area on the right side of [his] face with some type of foreign object by [Sgt.] Johnston." (Id.) Plaintiff also told Dr. Blakey about his shoulder and knee injuries. (Id.) Plaintiff "was asked how is the prison explaining [his] injuries occurred?" (Id.) Plaintiff told Dr. Blakey that Sgt. Johnston asserts that Plaintiff "headbutted [Sgt.] Johnston in his face and that is what caused the injuries to [Plaintiff's] right eye." (Id.) Dr. Blakey informed

Plaintiff "that it was impossible for [his] injuries to be caused by a headbutt." (Id.)  Dr. Blakey further stated "that whatever [Plaintiff] was struck in the eye with had to be a foreign object" and "it was not a headbutt[]." (Id. at 24.)

On January 24, 2017, Plaintiff underwent the first of three surgeries "to repair [his] right eye orbital wall fracture." (Id.; see also id. at 24-25 (describing second and third surgeries).) Dr. Blakey conducted this surgery and "had to insert titanium plates to realign as well as repair and hold the right eye and bones together." (Id. at 24.)  Dr. Blakey "stated that the injuries or injury sustained (fractured right eye) was too severe to have occurred from a headbutt, which directly contradicts [Defendants'] asserted excuse, explanation, and/or defense." (Id.) Dr. Blakey "also stated that upon subpoena to the Court he will testify as to the injury and medical disposition on how [Plaintiff] received his injuries." (Id.)  Plaintiff underwent two more surgeries at Duke Hospital, during which Dr. Leyngold inserted additional titanium plates to address the fracture of Plaintiff's "orbital wall and floor," which "injuries stem from the assault by [Sgt.] Johnston" (id. at 25). (See id. at 24-25.) Dr. Leyngold informed Plaintiff that he "will forever have facial nerve and tissue damages from the top of [his] right eye to the bottom jaw, chronic pain of eye resulting in chronic migraines, [he will be] unable to hold jobs where sight is instrumental, [he will be]

unable to drive, [with an] equilibrium impairment, [he will require] special eye glasses, etc., for the rest of [his] life, with the possibility of re-injury resulting in further surgeries." (Id. at 25-26.) Plaintiff "required three and a half titanium plates to be placed inside on the inner walls of the bone of [Plaintiff's] right eye to try and to hold [his] eye ball in place[]." (Id. at 28.)

## II. Defendants' Evidence

Defendants provided various affidavits and prison records in support of their Motion. (See Docket Entries 53-1 to 53-4.) For instance, Sgt. Johnston averred:

> In January 2016, [Sgt. Johnston] was a Correctional
> Sergeant at Scotland Correctional Institution, where
> [Sgt. Johnston is] still employed today.
>
> On January 22, 2016, [Sgt. Johnston] heard a call
> for assistance on the radio. [Sgt. Johnston] reported to
> the Blue Unit to find that [Plaintiff] had been
> restrained after assaulting two female staff members.
> [Sgt. Johnston] and Officer Harrington escorted
> [Plaintiff] to Receiving so that he could be
> decontaminated. While escorting him, [Plaintiff]
> attempted to jerk away from [them]. When [they] got to
> Receiving [Sgt. Johnston] started to conduct a pat frisk
> of [Plaintiff] to ensure that he did not have any
> contraband or weapons. While conducting the search,
> [Plaintiff] head-butted [Sgt. Johnston] above [Sgt.
> Johnston's] left eye. [Sgt. Johnston] then placed
> [Plaintiff] on the floor face down to regain control of
> [Plaintiff]. While on the ground, [Plaintiff] attempted
> to kick [Sgt. Johnston's] right leg. [Sgt. Johnston]
> then gained control of his upper torso, and Officer
> Harrington gained control of his lower torso. After
> completing the search, [they] placed [Plaintiff] in the
> shower to be decontaminated. [Plaintiff] was then
> medically screened before he was taken to Restrictive
> Housing.

[Sgt. Johnston] understand[s] that [Plaintiff] claimed that [Sgt. Johnston] had a conversation with Lieutenant Ferguson about how to retaliate against [Plaintiff]. [Sgt. Johnston] never had such a conversation with Lieutenant Ferguson.

[Sgt. Johnston] understand[s] that [Plaintiff] claimed that [Sgt. Johnston] made a comment about him liking to beat women. [Sgt. Johnston] never made such a comment.

[Sgt. Johnston] understand[s] that [Plaintiff] claimed that [Sgt. Johnston] struck him in the face with some kind of foreign object. [Sgt. Johnston] never struck him in the face with any object.

[Sgt. Johnston] understand[s] that [Plaintiff] claimed that [Sgt. Johnston] removed his clothes while conducting [Sgt. Johnston's] search. [Sgt. Johnston] never removed his clothes.

[Sgt. Johnston] understand[s] that [Plaintiff] claimed that [they] placed him in segregation half-naked, without being decontaminated, and without medical screening. [Plaintiff] was given clean clothes, screened by medical, and decontaminated that night.

[Plaintiff] is just another inmate to [Sgt. Johnston]. [Sgt. Johnston] did not then, and do[es] not now, hold any feelings of ill-will towards him. [Sgt. Johnston] ha[s] never wanted to harm [Plaintiff]. By completing the above actions, [Sgt. Johnston] was merely performing [his] duties as Correctional Sergeant.

(Docket Entry 53-3, ¶¶ 2-9 (internal paragraph numbering omitted).)

For her part, Nurse Sullivan averred:

In January 2016, [Nurse Sullivan] was employed by the [NCDPS] as a Registered Nurse at Scotland Correctional Institution. [Nurse Sullivan] ha[s] been employed by NCDPS for more than 15 years.

[Nurse Sullivan] was working at Scotland CI on the night of January 22, 2016. [Nurse Sullivan] heard on the radio a call for assistance. [Nurse Sullivan] later learned that the call for assistance was in relation to

14

[Plaintiff] assaulting two staff members — Sgt. Locklear and Ofc. Locklear.

[Nurse Sullivan] assisted in evaluating Sgt. Locklear and Ofc. Locklear. Sgt. Locklear was badly injured and required outside medical treatment. [Nurse Sullivan] provided two statements as part of the Incident Report regarding their respective injuries, and those statements are accurate.

That night, [Nurse Sullivan] evaluated [Plaintiff]. When [Plaintiff] appeared before [Nurse Sullivan], he had already been decontaminated. He was partially clothed, but was given clean clothes during the examination. [Nurse Sullivan] ha[s] reviewed Plaintiff's medical records regarding [her] exam of Plaintiff, and the records are accurate. The medical records show that [Nurse Sullivan] conducted a standard post use-of-force exam of Plaintiff. [Nurse Sullivan] diagnosed him with an "ecchymotic area" (i.e. bruised area) to his right eye. [Nurse Sullivan] cleaned Plaintiff's wound and cleared him to be taken to segregation.

On or about January 23, 2016, [Nurse Sullivan] gave a written statement to Unit Manager Ingram, which stated, in part, that "A use of force assessment was performed on [Plaintiff] at 2200 on 1/22/16. He has been decontaminated, given clean clothing." That statement is accurate.

[Nurse Sullivan] understand[s] that Plaintiff claims that [Nurse Sullivan] only took his vitals without doing anything else. That allegation[] is false, as demonstrated by his medical records.

[Nurse Sullivan] tried to be courteous and professional towards Plaintiff that night, offering hi[m] a cup of water and other pleasantries, but Plaintiff just spit it on the floor in [Nurse Sullivan's] direction. Generally, [Nurse Sullivan] would characterize him as uncooperative.

[Nurse Sullivan] also understand[s] that Plaintiff claims he did not have clothes for quite some time after January 22, 2016. While [Nurse Sullivan] do[es] not recall seeing him after that date, [Nurse Sullivan] understand[s] that Plaintiff received foot soaks during this timeframe. He would not have been allowed to have

15

a foot soak while naked – he would have needed to have been clothed.

     [Plaintiff] is just another inmate to [Nurse Sullivan]. [Nurse Sullivan] did not then, and do[es] not now, hold any feelings of ill-will towards him. [Nurse Sullivan] ha[s] never wanted to harm [Plaintiff].

(Docket Entry 53-2, ¶¶ 2-10 (internal paragraph numbering omitted).)

The referenced medical records reflect that, at 22:08 on January 22, 2016, Nurse Sullivan performed a "Use of Force Evaluation encounter . . . at Receiving & Discharge" on Plaintiff, whose "Chief Complaint" was identified as "Pain." (Docket Entry 53-1 at 41 (emphasis omitted).) The "Subjective" summary of that complaint states: "Offender being assessed for use of force. He states that he is in pain and is actively hyperventilating. He has been instructed to breathe through his nose and out through his mouth. He is unable/unwilling to listen. He has bruising and a small abrasion/skin tear to his R eye." (Id. (emphasis omitted).) The "Complaint" section contains no more information, notwithstanding sections for, e.g., "Pain Location," "Pain Scale," and "Pain Qualities." (Id. (emphasis omitted).) The "ROS" states that, as to the neurological, sensory system, "No: Numbness." (Id. (emphasis omitted).) As for the "Nursing Exam," the "Pain Assessment" indicates that "No: Severity/Quality Assessed during Chief Complaint," but for the "Review of Nutrition and Vital Signs," "Yes: Vital signs obtained (see flowheets [sic])." (Id.

16

(emphasis omitted).) The "Objective" section contains information regarding Plaintiff's pulse, respiration, blood pressure, and "SpO2," but lists his height and weight as "Unavail[able]." (Id. at 41-42 (emphasis omitted).)

The "Exam" Section indicates that for "Diagnostics," a "Medication Review" occurred but as for "Other" Diagnostics, "No: See System/Subsystem for Injury Assessment." (Id. at 42 (emphasis omitted).) For Plaintiff's "General" "Appearance," it reflects "Yes: Appears in Pain, Visible Injury" and "No: Appears in Distress." (Id. (emphasis omitted).) For his "Skin," the "General" category relates "No: Localized Edema, Dry, Warmth, Diaphoretic," while the "Wound" category states "Yes: Wounds present" and the "Color" category states "No: Cyanosis, Jaundiced." (Id. (emphasis omitted).) For the "Pulmonary" section, the "Observation/Inspection" notes "No: Normal, Stridor, Nasal Flaring" and the "Auscultation" section states "Yes: Clear to Auscultation." (Id. (emphasis omitted).) The "Musculoskeletal" section reflects for the "Wrist/Hand/Fingers ROM and Tests," "Yes: Radial Pulse Normal, Capillary Refill Normal," and for the "Ankle/Foot/Toes ROM and Tests," "Yes: Dorsalis Pedis Normal, Posterior Tibialis Normal, Capillary Refill Normal." (Id. (emphasis omitted).) For the "Neurologic" section, the "Motor System-Strength" records "Yes: Normal Muscular Strength - [R]" and "Level of Consciousness" indicates "Yes: Alert and Oriented to Person, Alert and Oriented to

17

Place, Alert and Oriented to Time." (Id. (emphasis omitted) (brackets in original).) As for "Mental Health," the "Thought Process" section states "No: Logical, Goal Directed, Incoherence." (Id. (emphasis omitted).)

Next, the "Assessment" section reports: "Behavior-Altered[.] Offender to medical/receiving post assault on 2 staff members and post altercation. He has a[n] ecchymotic area to his right eye, is hyperventilating, and when given a cup of water and spoken to, he spits on the ground. His eye has been cleaned, he has been decontaminated and he is medically stable to be taken to segregation." (Id. (emphasis omitted).) The "Plan" directs "Return Immediately if Condition Worsens" for the "Disposition" and confirms that no patient education occurred. (Id. at 43 (emphasis omitted).)

With the exception of a "Non Patient Contact" on February 10, 2016, in which a "2500 MNT diet [wa]s renewed until 11/2016" (id. at 40), Plaintiff's next medical record involves an encounter on March 8, 2016, when Nurse Moore evaluated him for complaints regarding blurred vision as well as pain in his right eye, left shoulder, and left knee "from an altercation" (id. at 34). (See id. at 34-38.) The medical notes reflect that Plaintiff's "[r]ight eye [remained] swollen [with] discoloration around the orbital," "[n]o draining around the eye," and "[e]ye reactive light equal." (Id. at 34.) Plaintiff had a "[s]lightly swollen left shoulder

18

[that] hurt when palpated." (Id.) He was "[u]nable to extend [his] left arm," which remained "warm to touch," and he experienced "[p]eriodic numbness and tingling mostly when [he] sleep[s] on it." (Id. at 37.) As for his knee, "[n]o swelling [was] noted" and the "[l]eft pedal pulse [was] palpable," but the "knee [was] warm to touch" and his "[l]eft leg [was] slightly red." (Id.) A "Vision Screen" details Plaintiff's "Distance Vision," but no other results. (Id. at 36 (emphasis omitted).) The "Exam" section details multiple evaluations, including of his "Eyes," where the "General" section notes "Yes: PERRLA, Extraocular Movements Intact," and of his "General" "Appearance," which notes "Yes: Appears in Pain, Visible Injury, Alert and Oriented to Time, Place, and Person" and "No: Unconscious, Lethargic, Obtunded." (Id. at 36 (emphasis omitted).)

The "Assessment" notes "Acute pain related to joint trauma to the left [sic] eye, left knee and left shoulder." (Id. at 37 (emphasis omitted).) The "Plan" involved two 200mg ibuprofen tablets as needed for five days and the "non-urgent joint trauma" protocol, involving "RICE: Rest Ice Compress Elevate," a sling for shoulder pain, and crutches for 48-72 hours, as well as "[r]efer[ring] to MD for post eye trauma per eye trauma protocol" and scheduling an appointment for the following day at the "Provider Clinic" for "[t]rauma to left knee, left [sic] eye and left shoulder due to altercation and use of force on February 10

19

[sic], 2016." (<u>Id.</u>)[8] The "Disposition" states "Refer to Provider" and "Return Immediately if Condition Worsens." (<u>Id.</u>) Finally, Nurse Moore "request[ed] x-ray of the right eye, left shoulder and left knee to rule out any torn ligaments or tissue damage." (<u>Id.</u> at 34.)

The next medical record details a "Provider Evaluation encounter performed at [the] Restrictive Housing Unit" on March 12, 2016. (<u>Id.</u> at 30.) It describes Plaintiff's first "Chief Complaint" as:

> Involved in an altercation 'with officers', 2/10/2016 [sic]. States he was never evaluated by medical and has been having problems with his left shoulder. He sustained a laceration on the right eye brow that is now healed. Inmate without pain if sitting still, but noted grimacing and limitation on ROM. Also complaining of pain to the left knee, able to ambulate without difficulty[,] with a full range of motion, states the pain is only there when he does certain moves with the knee, encouraged to avoid movements that trigger or aggravate the pain.

(<u>Id.</u> (emphasis omitted).) As for his "Chief Complaint" regarding "Eyes/Vision Problems," the record states: "Inmate has a complain[t] of visual changes, he has a pair of glasses, but is not wearing it during this visit, unable to check acuity. Denies pain in the affected eye." (<u>Id.</u> at 31 (emphasis omitted).)

---

8    Plaintiff's infraction history does not reflect any violations between January 22, 2016, when it notes, inter alia, assaults, and October 16, 2016, when it notes, inter alia, disobeying an order. (<u>See id.</u> at 12.)

The provider's "Assessment" reflects, as relevant, a "sprain of left shoulder joint" (id. (emphasis omitted)) and the report includes a radiology request for the left shoulder as well as a "UR Request" due to the "[i]nmate complaining of visual changes, wears glasses and it has been a year since the last check" (id. at 32). The "Disposition" states "Follow-up at Sick Call as Needed" and "Refer to Provider." (Id. (emphasis omitted).)

According to the medical reports, on March 14, 2016, the same provider also requested that a "prednisone taper be added to [Plaintiff's] medication orders for shoulder pain. Tapering over 6 days." (Id. at 28.) On March 16, 2016, a different medical provider reviewed Plaintiff's shoulder x-ray, noting that it revealed a "normal shoulder" with "no fractures or dislocations." (Id. at 27.) However, a medical report from March 25, 2016, indicates that Plaintiff was "[s]till experiencing pain with movement" as well as a decreased range of active and passive motion in his left shoulder. (Id. at 25.) The medical report provides a prescription for, inter alia, 800mgs of ibuprofen three times a day for 14 days and a request for a physical therapy evaluation. (Id. at 26.)

The medical records also include a "Health Screen" (id. at 19 (emphasis omitted)) conducted at Polk on March 29, 2016. (See id. at 19-24.) It notes Plaintiff's asthma (id. at 19), an "[u]nknown" history of head trauma, no history of loss of consciousness, and

21

problems with his "left shoulder[,] suppose[d] to see a therapist" (id. at 21), but "[n]o" observation of "[s]igns of [r]ecent [t]rauma" (id. at 22 (emphasis omitted)). Finally, the medical reports include records from an "Optometry encounter performed at [an outside (see id. at 16)] Clinic" for "Eyes/Vision Problems" involving blurry vision. (Id. at 17.) The "Assessment" indicates chronic "Presbyopia." (Id. (emphasis omitted).)[9] The report includes a prescription for glasses (id. at 18) and instructions to "Follow-up at Sick Call as Needed" (id. at 17).

Defendants also submitted an Incident Report regarding the events on January 22, 2016. (See id. at 44-80; see also id. at 2 (identifying "Exhibit F [a]s a true and accurate copy of the Incident Report from January 22, 2016, including witness statements")). The Incident Report reflects that Unit Manager Ingram served as the "Investigating Officer" (id. at 44-45 (emphasis omitted)) and contains a summation of events, witness statements from Scotland Correctional staff involved in the incident, including Sgt. Johnston and Nurse Sullivan, and pictures of Plaintiff and the injured officers (see id. at 44-80). As relevant here, Nurse Sullivan's statement regarding Plaintiff relates that:

---

9 "Presbyopia" signifies "[f]arsightedness caused by loss of elasticity of the lens of the eye, occurring typically in middle and old age." Presbyopia, Oxford English Dictionary, available at https://www.lexico.com/en/definition/presbyopia (last visited July 25, 2022).

A use of force assessment was performed on [Plaintiff] at 2200 on [January 22, 2016]. He has been decontaminated, given clean clothing. He has an ecchymotic area around his right eye and a red area to the back of his neck. He is hyperventilating. This RN, [Nurse] Sullivan attempted to give him water to drink, and he spit the water on the floor. His wound on his [right] eye has been cleaned and he is medically stable to go to Segregation.

(Id. at 67.)

Sgt. Johnston's witness statement reports:

[Sgt.] Johnston responded to a Code 7 on the Blue Unit, in C-Pod. When [he] arrived [he] assisted in escorting [Plaintiff[10]] who had just assaulted Sergeant Locklear, to Receiving where [Plaintiff] attempted to jerk away, while being escorted. While in Receiving[, Sgt. Johnston] attempted to conduct a pat frisk on [Plaintiff]. As [Sgt. Johnston] was conducting the search[, Plaintiff] headbutted in [sic] the face striking [Sgt. Johnston] just above [Sgt. Johnston's] left eye. [Sgt. Johnston] then placed [Plaintiff] on the floor face down to regain control. [Plaintiff] then attempted to kick [Sgt. Johnston's] right leg. [Sgt. Johnston] then gained control of [Plaintiff's] upper torso, while Officer Harrington took control of [Plaintiff's] lower torso. [Sgt. Johnston] completed the pat and frisk search and placed [Plaintiff] in the shower for decontamination. [Sgt. Johnston] assisted in escorting [Plaintiff] to Medical for assessment and to Restrictive Housing. [Sgt. Johnston] was not injured during the incident and required no medical attention. [He] returned to [his] assigned post for duty.

(Id. at 58.)

Officer Harrington similarly stated:

---

10    A witness statement from Officer Marquise Ferguson indicates that he sprayed Plaintiff with O.C. Pepper Spray in the Blue Unit C-Pod, handcuffed him, and, with Officer Harrington, "escorted [Plaintiff] out of the pod," after which he "passed off [Plaintiff] to Sergeant Johnston." (Id. at 57.)

23

> [He] responded to a Code 7 on the Blue Unit in C-Pod. When [he] arrived [he] assisted in restraining [Plaintiff] who had just assaulted Sergeant Locklear. [Officer Harrington] escorted [Plaintiff] to Receiving where [Plaintiff] became combative and as Sergeant Johnston went to conduct a pat and frisk search of [Plaintiff, Officer Harrington] observed [Plaintiff] headbutt Sergeant Johnston in his facial area. [Officer Harrington] assisted in placing [Plaintiff] on the floor and while [Plaintiff] was on the floor[, Plaintiff] attempted to . . . kick Sergeant Johnston. [Officer Harrington] then gain[ed] control of [Plaintiff's] lower torso, until a pat and frisk could be completed. [Officer Harrington] then assisted Sergeant Johnston in placing [Plaintiff] in the shower for decontamination. [Officer Harrington] assisted in escorting [Plaintiff] to medical for assessment. [Plaintiff] was then escorted to Restrictive Housing. [Officer Harrington] was not injured during the incident and required no medical attention.

(Id. at 59.)

Witness statements from two other responding officers confirm that Plaintiff "was resisting" (id. at 60) and "continued to pull away" (id. at 61) during his escort to Receiving, where, after he "was placed in cell IR-18 to be searched" (id.; see also id. at 60), he "became combative" (id. at 60) and/or "headbutted Sgt. Johnston" (id. at 61). As for Plaintiff's account of the events, the Incident Report contains a witness statement form, signed by Unit Manager Ingram and another individual, relating that "[Plaintiff] refused to write a statement." (Id. at 70; see also id. ("[Plaintiff] refused to sign the statement.").)

The Incident Report also includes three copies of the same two pictures of Plaintiff. (See id. at 71-73.) The pictures appear to show Plaintiff sitting in a chair in a room with his arms behind

24

his back while a male officer[11] assists a female medical provider in putting a blood pressure cuff around Plaintiff's right arm. (See id. at 71.) The pictures only depict Plaintiff, who wears a grey shirt, from the waist up. (See id.) Plaintiff's eyes remain closed in the pictures, but a cut appears on his right eyebrow and visible discoloration and swelling surround his right eye. (See id.)

> For his part, Unit Manager Ingram averred:
>
> In January 2016, [Unit Manager Ingram] was a Correctional Housing Unit Manager at Scotland Correctional Institution. More specifically, [Unit Manager Ingram] was the Unit Manager for the Blue Unit[,] which meant that part of [his] job duties included responding to offender grievances and completing incident reports for the actions that occurred in [his] unit (assuming [he] was not personally involved). Since then, [Unit Manager Ingram] ha[s] been promoted to Captain.
>
> [Unit Manager Ingram] was not working the evening of January 22, 2016. However, [Unit Manager Ingram] was informed that [Plaintiff] assaulted two staff members. In the following days, [Unit Manager Ingram] completed the use-of-force investigation for [Plaintiff's] assault on staff and their resulting use of force. The Incident Report that was generated as a result of that investigation is truthful and accurate to the best of [Unit Manager Ingram's] knowledge. [Unit Manager Ingram] also responded to [Plaintiff's] grievance regarding the incident. Otherwise, [Unit Manager Ingram] was not present for or involved in the incident.
>
> Aside from attempting to get a statement from [Plaintiff], [Unit Manager Ingram] did not see [Plaintiff] in the days following the incident because [Plaintiff] was housed in Red Unit (a different unit than [Unit Manager Ingram's] unit). [Plaintiff] never

---

11 Although blurry, the officer's name tag appears to read "Harrington." (Id. at 72.)

25

complained to [Unit Manager Ingram] about lack of medical attention, clothing, showers, or anything else.

[Unit Manager Ingram] understand[s] that [Plaintiff] complained about another female Unit Manager,[12] but [Unit Manager Ingram is] a male. So, those complaints must not relate to [Unit Manager Ingram].

[Plaintiff] is just another inmate to [Unit Manager Ingram]. [Unit Manager Ingram] did not then, and do[es] not now, hold any feelings of ill-will towards him. [Unit Manager Ingram] ha[s] never wanted to harm [Plaintiff]. By completing the above actions, [Unit Manager Ingram] was merely performing [his] duties as a Unit Manager.

(Docket Entry 53-4, ¶¶ 2-6 (internal paragraph numbering omitted).)

As indicated, Plaintiff submitted a grievance regarding these events. (See Docket Entry 53-1 at 89-99.) The grievance states:

[Plaintiff is] writing this grievance in regards to excessive force used on [him] on [the] date of [January 22, 2016]. After the altercation that occurred between [him] and Sgt. H. Locklear and Ofc. Tinoka Locklear[, Plaintiff] willfully submitted to the handcuffs. [He] was being escorted out of the block by two officers off the unit into the main hallway. Sgt. Michael Johnston arrived and informed the officer who had [Plaintiff's] right arm doing the escort that he would escort [Plaintiff] to Receiving. Once Sgt. Johnston applied the escort maneuver he stated to [Plaintiff] so you like to beat on women huh. As [Plaintiff] was being escorted to Receiving[, Sgt. Johnston] kept pushing his weight down on [Plaintiff] making it difficult for [Plaintiff] to walk or stand adequately. [Plaintiff] then stated to the officers that [he] cannot breathe due to [him] being pepper sprayed from Ofc. Ferguson[, as Plaintiff] suffered from asthma. [When they] arrived at Receiving due to [Plaintiff] walking slump[ed] over and trying to breathe once [he] tried to stand while [his] legs were weak. [He] lift[ed his] head up and [he] beg[a]n to feel

_____

12  Paula Jacobs apparently served as the Unit Manager of the Red Unit during the relevant period. (See Docket Entry 53-1 at 97.)

a sharp pain to [his] right eye[. He] became
unconscious. When [he] regained consciousness [he]
noticed a big pool of blood in front of [him. His] right
eye was busted completely open. [His] clothes w[ere]
removed from [his] body[. Plaintiff] was placed in [a]
slump[ed] over position in which [he] could not breathe
[and his] face was facing the wall in which all staff
involved were behind [him]. When [he] stated [he]
couldn't breathe someone else responded if you can talk
you can breathe. They then proceeded to take [him] to
Segregation[. U]pon arriving to Segregation they place[d
him] in a cell without decontaminating [him] from being
pepper sprayed. [He] was not offered any medical
assistance for being pepper sprayed or from being
assaulted. [Plaintiff] also did not receive treatment
for [his] busted eye [sic] right eye or left shoulder
that was injured from [him] being assaulted by staff.
[He] was in a cell for 9 days without clothing[. He] was
denied access to a shower. When [he] requested only
clothing[, he] was denied and was told that the only way
[he] could get anything was if the superintendent
approved it. [He] was also denied medical emergencies
and sick calls.

(Id. at 90-92.) As for Plaintiff's requested remedy, the grievance

relates that Plaintiff "would like for Sgt. Michael Johnston [to]

be held accountable for his actions." (Id. at 90.)

Unit Manager Ingram provided the "Step One - Unit Response"

(id. at 98 (emphasis omitted)) to Plaintiff's grievance, as

follows:

On January 22, 2016 you[, Plaintiff,] w[ere]
involved in an assault on staff at Scotland Correctional.
During the assault a Use of Force was initiated by
Officer Ferguson who administered O.C. Pepper Spray to
prevent further injury [to] staff. While being escorted
to Receiving to be decontaminated and to conduct a #pat
and frisk# search by Sergeant Johnston and Officer
Harrington, for possible contraband, you had to be
assisted by staff due to the effects of the O.C. Pepper
Spray. During the attempted search you became aggressive
towards staff and head-butted Sergeant Johnston in the
face, causing a laceration to your right eye. Another

27

use of force was initiated to regain control of the situation. Sergeant Johnston did not state at no time did he [sic] make the comment to [sic] that you like to beat on women nor did he place his weight on you to prevent you from breathing. Sergeant Johnston stated he did assist you to Receiving due to the effects of the O.C. Pepper Spray. Both Sergeant Johnston and Officer Harrington stated at no time did they remove your clothing from your person and the only blood on the floor was from the wound above your eye, from when you head-butted Sergeant Johnston. According to the incident report you were treated for the laceration to your right eye and the hyperventilation. According to Nurse Moore [sic] stated [sic] you did not inform her any [sic] shoulder pain you were having. But you were treated per nursing protocol for the injury to your right eye and for O.C. Pepper Spray exposure. Nurse [sic] P. Jacobs Assistant Unit Manager stated no time were you denied access to a shower, clothing, or medical emergency from staff. Mr. W. Bullard Assistant Superintendent III stated at no time did he instruct staff not to give a shower, clothing, or medical emergency. Mr. Bullard also stated that he was not present on the day of assault. Staff treated you with courtesy and professionalism according under [sic] [NCDPS] policy and procedures.

(Id. (symbols in original).)

Plaintiff appealed this response. (See id.) The "Step Two - Area/Complex/Institution Response" states: "The Step 1 Response given adequately addressed this grievance. Therefore no further action is recommended at this time." (Id. at 99 (emphasis omitted).) Plaintiff also appealed that response. (See id.) The "Step Three - Administrative Remedy Response" (id. at 89 (emphasis omitted)) states:

Inmate John Hicks filed this grievance at Scotland Correctional Institution on January 22, 2016.[13] The

_____

13 As Plaintiff submitted the grievance at Polk Correctional
(continued...)

> inmate stated he was assaulted by staff and denied medical treatment. Staff response indicated that an investigation of the inmate's complaint was conducted. Staff concluded that the inmate has not been treated unfair[ly] or outside the scope of correctional policies and procedures.
>
> This examiner has carefully reviewed the grievance and the response given by staff in the DC-41 0A response. From this review, I am convinced that staff has adequately addressed this inmate's grievance concerns. I adopt the facts found by the staff investigator.
>
> On this record, this inmate's allegations are insufficiently supported. Thus, this grievance is dismissed for lack of supporting evidence.

(Id.)

### III. Plaintiff's Response

In opposition to the Motion, Plaintiff submitted his verified Response (Docket Entry 59) and assorted exhibits (Docket Entries 59-1 to 59-26). As relevant here, this material reflects:

NCDPS policies provide that "[a]n offender subject to pepper spray will be given an immediate opportunity to flush his or her eyes once control has been restored." (Docket Entry 59-4 at 4.) Here, "[Officer] Ferguson had regained total control of [Plaintiff]: he sprayed him, gave him a direct order to submit to handcuffs, got him to comply singlehandedly, and handcuffed [Plaintiff] behind his back. There is no eye-decontamination fountain in Receiving, it's in Medical: Officer [Ferguson] should

___

13(...continued)
in April 2016 (see id. at 90), this sentence should probably read "[Plaintiff] filed this grievance [about events] at Scotland Correctional Institution on January 22, 2016" (id. at 89).

have taken [Plaintiff] to Medical, not 'turned him over to Sergeant Johnston.'" (Docket Entry 59 at 5.) For his part, Sgt. Johnston's "intentions are clear." (Id.) "[T]here is no clear reasoning in why he's taking a sprayed inmate, handcuffed behind his back, to Receiving instead of Medical, to the eye-wash station." (Id. at 5-6.) As other officers noted in their Incident Report witness statements, Plaintiff "was being placed inside a cell, cell IR-18 (for Inmate Receiving). There's no shower in that cell; there's no eye-wash station." (Id. at 6.) Plaintiff also "did not attempt to jerk away, while being escorted" "to Receiving." (Id. at 7 (internal quotation marks omitted).)

Per NCDPS policies, "[i]mmediate medical treatment is required following a use of force incident." (Docket Entry 59-4 at 12; see also id. (requiring medical screening "as soon as possible after the cessation of a use of force incident" and stating that "[a]pplication of one or more of the following circumstances will require immediate medical treatment: (1) The offender complains of injury; (2) Staff observe any injury; (3) Staff employed . . . pepper spray, chemical mace, a baton or any other device likely to cause injury; or (4) The amount of force used has rendered the offender immobile, unconscious or unable to communicate").) However, Nurse Sullivan did not conduct an assessment of Plaintiff for more than an hour after officers pepper sprayed and hit him. (Docket Entry 59 at 9.) Nevertheless, "Nurse Sullivan still sees:

a) 'a red area to the back of his neck;' b) 'an ecchymotic area
<u>around</u> his right eye;' and, c) 'he is hyperventilating.'"  (<u>Id.</u>
(emphasis in original).)  Moreover, the NCDPS Nursing Protocols
regarding use of Pepper Spray cites a history of "[a]sthma" as
relevant to the appropriate treatment and deems "urgent" anyone
with "[s]evere dyspnea,"[14] recommending interventions including
"[a]ctivate EMS."  (Docket Entry 59-15 at 5 (all-cap font and
emphasis omitted).)

    The above-mentioned pictures reflect Plaintiff "beginning
[the] assessment — in Receiving, not [inside the] Medical
Department."  (Docket Entry 59 at 10.)  As for Plaintiff's face in
the pictures:  "that is <u>not</u> 'a laceration' <u>over</u> his right eye, as
[Defendants] claim.  It is what the nurse said:  'an ecchymotic
area <u>around</u> his . . . eye.' . . . [Y]et she failed to mention his
other eye swollen closed, and his seriously busted and swollen-fat
lip. For correctional [Defendants] to claim an individual headbutt
— that is alleged to have been perpetrated by an individual who has
no balance or equilibrium, with handcuffs on behind his back,
sprayed with some type of pepper spray mace[ — caused such
injuries] is asinine."  (<u>Id.</u> (emphasis and ellipses in original).)

_____

    14  "Dyspnea" means "[d]ifficult or labored breathing."
<u>Dyspnea</u>, Oxford English Dictionary, available at
https://www.lexico.com/en/definition/dyspnea (last visited July 25,
2022).

"Here's the problem: there's no camera inside cell IR-18, but there is _in_ Receiving. A pat-and-frisk, with six officers on a handcuffed individual[,] need not be in a camera-less cell. In fact, it shouldn't be." (_Id._ at 11 (emphasis in original).) Various inconsistencies exist among the witness statements and photograph time-stamps included in the Incident Report (_see id._), which Plaintiff believes evidences "collusion" (_id._ at 12). The Response asserts that Unit Manager Ingram forged Sgt. Johnston's signature on a witness statement that Sgt. Johnston provided in response to Plaintiff's grievance (_see_ Docket Entry 59-20 at 1). (_See_ Docket Entry 59 at 12.) Specifically, the Response states: "Plaintiff's Exhibit — 22 (4pgs.), is 4-pages of a Report concerning the Use of Force, prepared by none other than Blue Unit Manager, Jerry Ingram, Jr. — whose handwriting and signature [are] identical to the forger of Plaintiff's Exhibit 20, 21 (and State's Exhibit H of Document 53-1, page 94, 95)." (_Id._) "The 4-pages of Exhibit 22 are part of a scenario from Ingram, Jr., of what happened . . . . the same Jerry Ingram, Jr. of Blue Unit Management, who says that Plaintiff Hicks refused to write a statement [during the Incident Report investigation]. Plaintiff takes exception [to that assertion, and] 100% dispute[s Unit Manager Ingram's statement that Plaintiff refused to provide or sign a witness statement (_see_ Docket Entry 59-23 at 1)]." (Docket Entry 59 at 12.)

The Response also emphasizes that Scotland Correctional remained short-staffed on the night of the incident due to an ice storm, causing multiple staff members to work extra shifts. (Id. at 13.)  Per the Response, "[w]ith staff already working 12-hour shifts, on top of a staff shortage crisis, these defendants were cruising to deliver a bruising, on any inmate, no matter how excessive of the conjective [sic] 'Use of Force' became an outright felony assault."  (Id. at 13-14.)  The Response concludes: "Plaintiff hereby opposes [the Motion] wholeheartedly with 100% disputed fact, issues and material.  Defendants' [Motion] should be denied."  (Id. at 14.)

**DISCUSSION**

**I. Relevant Standards**

**A. Summary Judgment Standards**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing the absence of such dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

33

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that

34

"[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment).  Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury.  See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

However, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted).  Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial").  Notably, though, in Scott,

> the [United States] Supreme Court was faced with a
> videotape of the incident in question that "utterly
> discredited" the plaintiff's account, rendering it a
> "visible fiction." 550 U.S. at 380–81. As between a

35

videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

As [the United States Court of Appeals for the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275–76 (4th Cir. 2019) (ellipsis in original) (parallel citations omitted).

**B. Eighth-Amendment Standards**

**i. Excessive Force Standards**

"The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" Thompson v. Commonwealth of Va., 878 F.3d 89, 97 (4th Cir. 2017) (quoting Estelle v. Gamble, 429 U.S.

36

97, 103 (1976)). "That protection imposes on prison officials an affirmative 'obligation to take reasonable measures to guarantee the safety of . . . inmates.'" Id. (ellipsis in original) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)). Accordingly, in evaluating an eighth-amendment excessive force claim, the Court "must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. at 98 (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). In conducting this analysis, the Court considers "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted).

Notably, a prisoner need not suffer a significant injury to prevail on an excessive force claim. See Thompson, 878 F.3d at 98; see also Hudson, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." (citation omitted) (citing Whitley, 475 U.S. at 327)). "The excessive force analysis thus focuses on the maliciousness of the force used, not the severity of the injury that results from that force." Thompson, 878 F.3d at 101; see also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) ("An inmate who is

37

gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). As the Fourth Circuit recently explained:

> Although [courts] once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed. So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury.

*Dean v. Jones*, 984 F.3d 295, 303 (4th Cir. 2021) (emphasis in original) (citation omitted).[15]

As for the subjective component, "[t]he state of mind required in excessive force claims is 'wantonness in the infliction of pain.'" *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 322); *see also id.* ("Put differently, the 'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" (quoting *Hudson*, 503 U.S. at 7)). The Supreme Court has identified four factors to assist courts in determining whether an officer acted with "'wantonness'":

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably

---

15    In this regard, although "an excessive force plaintiff need not show significant injury, the extent of injury may supply insight as to the force applied." *Cowart v. Erwin*, 837 F.3d 444, 453 (5th Cir. 2016).

38

> perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

Id. (quoting Whitley, 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321.

"In considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015). Notably, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Harris, 927 F.3d at 274 (internal quotation marks omitted). In this regard, the Fourth Circuit "ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized." Dean, 984 F.3d at 305 (explaining that, "[o]nce [the plaintiff] was subdued and [the defendant officer] no longer had reason to fear for officer or public safety, the use of force became unnecessary and unjustified — even if all of that transpired merely seconds after [the plaintiff] head-butted [the defendant officer]"); see also, e.g., Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not

39

justified even seconds later if the justification for the initial force has been eliminated.").

### ii. Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993); see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."). To establish a constitutional claim regarding his medical care, Plaintiff must show that Defendants "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko, 535 F.3d at 241 (citing Estelle, 429 U.S. at 104).

A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference where he possesses knowledge of the risk of harm to an inmate and knows that "his

actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994))).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (internal quotation marks omitted).

A plaintiff can also establish "a prima facie case of deliberate indifference" where "'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about

41

it.'" Id. (brackets and ellipsis in original) (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" Id. (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837). Furthermore, "a significant delay in the treatment of a serious medical condition may, in the proper circumstances," constitute deliberate indifference. Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008). "A[ constitutional] violation only occurs, however, if the delay results in some substantial harm to the patient. Thus, in order to defeat summary judgment on the delay issue, [a plaintiff i]s obligated to establish that the delay in his [treatment] caused him substantial harm . . . ." Id. at 166-67 (footnote omitted); see also Wynn v. Mundo, 367 F. Supp. 2d 832, 838 (M.D.N.C.) ("[D]elay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm.") (collecting cases), aff'd, 142 F. App'x 193 (4th Cir. 2005).

Moreover, the Eighth Amendment protects a prisoner's right to medical care, but not to the particular medical care that an individual prisoner may demand. See Smith v. Walker, 845 F. Supp. 2d 673, 677 (W.D.N.C.) ("The constitutional right is to medical

care. No right exists to the type or scope of care desired by the individual prisoner."), aff'd, 476 F. App'x 417 (4th Cir. 2012). Accordingly, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (affirming summary judgment against plaintiff on deliberate indifference claim where "[the plaintiff] allege[d] that he received inadequate medical treatment while at the clinic, and that he was discharged prematurely by [the defendant medical provider] before he had recovered sufficiently from his injuries," id. at 843, explaining that "[the defendant] and others provided [the plaintiff] with medical treatment on numerous occasions," and that "[the plaintiff's] allegation that his medical care was inadequate would, at most, constitute a claim of medical malpractice," id. at 849).

Conversely, the mere provision of some medical treatment does not automatically insulate a defendant from liability. See, e.g., De'lonta, 708 F.3d at 526 ("But just because [the defendants] have provided [the plaintiff] with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." (emphasis in original)). Thus, although "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be

43

adequate to address the prisoner's serious medical need." <u>Id.</u>
(footnote omitted); <u>see also</u> <u>Mandel v. Doe</u>, 888 F.2d 783, 789 (11th
Cir. 1989) ("When the need for treatment is obvious, medical care
which is so cursory as to amount to no treatment at all may amount
to deliberate indifference."). "[I]n this context the essential
test is one of medical necessity and not simply that which may be
considered desirable." <u>De'lonta</u>, 708 F.3d at 526 n.4 (internal
quotation marks omitted).

## II. Analysis

### A. Official Capacity Claims

Plaintiff seeks only monetary relief against Defendants. (<u>See</u>
Docket Entry 22 at 27, 32-34.) Defendants contend that the
Eleventh Amendment bars such claims. (<u>See</u> Docket Entry 53 at 10-
11.) Section 1983 does not permit damages suits against state
personnel acting in their official capacity. <u>See</u> <u>Will v. Michigan
Dep't of State Police</u>, 491 U.S. 58, 70-71 (1989). Accordingly, the
Court should grant Defendants' request for summary judgment on
Plaintiffs' official-capacity claims.

### B. Exhaustion Challenge

Defendants next assert that Plaintiff failed to exhaust
administrative remedies for some of his claims. (<u>See</u> Docket Entry
53 at 11-13.) Specifically, Defendants assert that, "[i]n the
[relevant] grievance, Plaintiff failed to mention anything about
being denied a mattress or hygiene products; failed to mention

44

anything about [Unit Manager] Ingram; [and] failed to mention anything about inadequate care by Nurses Ferguson and Sullivan." (Id. at 12.)

The Prison Litigation Reform Act of 1995, as amended (the "PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The defendant bears the burden of establishing that a prisoner failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Lee v. Willey, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without

45

the participation of a jury." (internal quotation marks omitted)).
A prisoner satisfies the PLRA exhaustion requirement when he "ha[s]
utilized all available remedies 'in accordance with the applicable
procedural rules,' so that prison officials have been given an
opportunity to address the claims administratively." Moore v.
Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (quoting Woodford v.
Ngo, 548 U.S. 81, 88 (2006)). "Compliance with prison grievance
procedures, therefore, is all that is required by the PLRA to
'properly exhaust.'" Jones, 549 U.S. at 218. Notably, the PLRA
imposes no requirement that a grievance name each individual sued
in the subsequent litigation. See id. at 219.

It remains unclear whether Plaintiff actually seeks to pursue
any claim regarding denial of a mattress or hygiene products
against any Defendants. (See, e.g., Docket Entry 22 at 27-31
(describing "events giving rise to [his] claim(s)" as misuse of
force, "facts underlying [his] claim(s)" as "assault[] by [Sgt.]
Johnston, for no valid reason other than revenge," injuries as
bodily harm and associated surgeries and impairments, and desired
relief as "compensation for his right eye being pushed completely
into his skull").) Nevertheless, given Plaintiff's grievance's
focus exclusively on the lack of clothing, without reference to
deprivations of other tangible items (see Docket Entry 53-1 at 90-
92), it does not appear "that prison officials have been given an
opportunity to address [any] claims [regarding mattress and hygiene

46

product deprivations] administratively," <u>Moore</u>, 517 F.3d at 725. (<u>See</u> Docket Entry 53-1 at 89-99 (reflecting prison understanding of grievance as challenging alleged assaults, denial of showers, clothing, and medical treatment during segregation, and medical treatment following assaults).) Similarly, Plaintiff's grievance provides no indication of his claims against Unit Manager Ingram. (<u>See</u> <u>id.</u>)[16] The Court should thus sustain Defendants' exhaustion challenge to Plaintiff's claims, if any, regarding denial of a mattress or hygiene products, as well as Plaintiff's claim against Unit Manager Ingram.

However, Plaintiff adequately exhausted his claims against Nurse Sullivan and Nurse Ferguson. Plaintiff's grievance gave "prison officials a fair opportunity to address the alleged inadequate care he received," <u>Moore</u>, 517 F.3d at 729, following the incident on January 22, 2016. (<u>See, e.g.</u>, Docket Entry 53-1 at 91-92 (alleging that Plaintiff "was not offered any medical assistance for being pepper sprayed or from being assaulted" and "did not receive treatment for [his] busted [] right eye or left shoulder that was injured from [him] being assaulted by staff"), 96 (statement from Nurse Moore regarding medical care on January 22,

---

16 Although the grievance does address Plaintiff's claims regarding the conditions of his confinement following the incident on January 22, 2016 (<u>see, e.g.</u>, <u>id.</u> at 91-92), the evidence establishes that Unit Manager Ingram did not oversee the unit which housed Plaintiff after that incident (<u>see, e.g.</u>, Docket Entry 22 at 18-19; Docket Entry 53-4, ¶¶ 2-5; Docket Entry 59 at 12).

2016).) Neither the PLRA nor NCDPS policies required Plaintiff to identify Nurse Sullivan and Nurse Ferguson by name in his grievance. See Jones, 549 U.S. at 219; NCDPS Policy & Procedures, Administrative Remedy Procedure, available at https://www.ncdps.gov/media/4268/download (last visited July 25, 2022). Accordingly, the Court should deny Defendants' exhaustion argument regarding Plaintiff's claims against Nurse Sullivan and Nurse Ferguson for alleged inadequate medical care following the incident on January 22, 2016.

## C. Deliberate Indifference Claim

The record does not establish that Nurse Sullivan and Nurse Ferguson acted with deliberate indifference regarding Plaintiff's post-incident medical care.[17] "Deliberate indifference is a very

_____

17 Plaintiff does not pursue an independent deliberate indifference claim against Sgt. Johnston, but instead presents his allegations regarding removal of his clothing and failure to decontaminate in support of his excessive force claim. (See, e.g., Docket Entry 2 at 27, 31-35 (explaining (i) that "[Sgt.] Johnston is being sued by [Plaintiff] . . . for assaulting [Plaintiff] while in handcuffs[,] subdued and not offering any resistance[,] causing severe injuries resulting in [Plaintiff] undergoing of multiple surgeries to repair [Plaintiff'] right eye, which is going to be a life long burden due to extensive damage," and (ii) that "[b]y assaulting [Plaintiff] in a sadistic and malicious mindstate [sic] [Sgt.] Johnston violated [Plaintiff's] 8th Amendment right" through "excessive use of force," and describing injuries as assault-related eye injury and resulting surgeries); Docket Entry 22 at 27 (describing facts underlying claim against Sgt. Johnston as revenge-motivated assault that injured Plaintiff's eye); Docket Entry 59 at 5-6 (asserting (i) that Sgt. Johnston's "intentions are clear," (ii) that his subsequent written statement [ha]s no clear reasoning why he's taking a sprayed inmate, handcuffed behind his back, to Receiving instead of Medical, to the eye-wash station —
(continued...)

high standard — a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Thus, "[n]egligence or malpractice in the provision of medical services does not constitute a claim under § 1983." Wright, 766 F.2d at 849. Accordingly, "[d]isagreements between an inmate and a [medical provider] over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Id.

Here, Plaintiff acknowledges that Nurse Sullivan conducted an "assessment" of him after his altercation with officers on January 22, 2016. (Docket Entry 59 at 10.) He asserts, however, that this "initial examination [was] done incorrectly." (Docket Entry 22 at 21.) As support for this assertion, he reports that he informed Nurse Moore on March 8, 2016, that he "was involved in a misuse of force" (id. at 20) and, upon locating "information [in the computer] that confirmed that what" (id. at 20) Plaintiff said about being "involved in a misuse of force" (id.) "was indeed true" (Docket Entry 2 at 19), Nurse Moore, "under her breath[, said] "'Oh my God'" (Docket Entry 22 at 20 (emphasis in original)). Plaintiff further asserts that, "[a]fter realizing that the initial

---

17(...continued)
especially since he had 6 (six) other officers with him," and (iii) that, given Plaintiff's placement in a cell with "no shower" or "eye-wash station" while he "was blind with spray, handcuffed behind his back, with no fight in him," and under another officer's "total control[,] . . . [t]here's not a reasonable jury . . . who wouldn't see through th[at] smoke and mirrors").)

examination had been done incorrectly, Nurse Evonne S. Moore first did a correct examination" (id. at 21), after which she prescribed pain relievers and recommended x-rays for Plaintiff's eye, knee, and shoulder (see id.).

On the current record, Plaintiff has not established the "exceptional circumstances" necessary for a viable deliberate indifference claim regarding his medical treatment on January 22, 2016. See generally Graening v. Wexford Health Servs., No. CV 1:20-400, 2021 WL 972278, at *6 (S.D. W. Va. Mar. 15, 2021) (finding that "[t]he allegations are exceptional enough to state a claim[ for deliberate indifference, where the p]laintiff had alarming symptoms; they got worse, not better, with the treatment; permanent hearing loss was potentially on the line; and months allegedly went by with no additional efforts to find out what was wrong with him"). First, Plaintiff's admission that Nurse Sullivan conducted an assessment of him following the incident on January 22, 2016, renders inapplicable cases involving a total failure to provide medical treatment, see, e.g., Iko, 535 F.3d at 232 ("At no point did the nurse provide any medical treatment to [the non-responsive inmate, who collapsed in her presence] or even come into physical contact with him."). Second, Plaintiff relies on mere speculation that Nurse Moore's statement constitutes (indirect) commentary on the medical care that Plaintiff received on January 22, 2016, rather than, for instance, a reaction to confirmation of

50

the use of force or the length of time that elapsed without additional treatment of Plaintiff's injuries between that use of force and the medical appointment on March 8, 2016. (<u>See</u> Docket Entry 22 at 20-21.) Third, although Plaintiff maintains that Sgt. Johnston's actions pushed Plaintiff's eye "completely into his skull causing the side walls and the floor of his inner right eye to be completely destroyed" (<u>id.</u> at 28), none of Plaintiff's medical records between January 22, 2016, and March 31, 2016, including from an optometry examination, reflect that any medical personnel perceived Plaintiff's eye injury as such a serious and extensive injury (<u>see</u> Docket Entry 53-1 at 16-43). Confronted with a visibly swollen eye area and cut eyebrow (<u>see</u> <u>id.</u> at 71), Nurse Sullivan diagnosed Plaintiff with "a[n] ecchymotic area" around his eye, cleaned his eyebrow wound, and instructed him to "Return Immediately if Condition Worsens" (<u>id.</u> at 42-43). Even if Nurse Sullivan's actions "may well represent a deviation from the accepted standard of care," <u>Jackson v. Lightsey</u>, 775 F.3d 170, 179 (4th Cir. 2014) (<u>compare</u> Docket Entry 53-1 at 34-38 (reflecting treatment for pain and compliance with "eye protocol" and "non-urgent joint trauma," "RICE" protocols), <u>with</u> <u>id.</u> at 41-43 (reflecting no treatment for pain, as well as no application of eye, joint trauma, or RICE protocols)), on this record, they fail

51

"to clear the 'high bar' of a constitutional claim," <u>Jackson</u>, 775 F.3d at 179.[18]

As for Nurse Ferguson, the verified complaints assert only that Nurse Moore found in the computer "notes that [Nurse] Sullivan, along with [Nurse Ferguson], nurses at Scotland Correctional, had taken documenting [Plaintiff's] vital signs without completing examination form but making a note that stated, unavailable, unconscious, which shows the lack of adequate medical attention [and] the denial of medical attention in itself." (Docket Entry 22 at 20; <u>accord</u> Docket Entry 2 at 19-20.) However, the record, including Plaintiff's medical reports (<u>see</u> Docket Entry 53-1 at 16-43), the Incident Report (<u>see</u> <u>id.</u> at 44-80), Plaintiff's grievance and response thereto (<u>see</u> <u>id.</u> at 89-99), and Nurse Sullivan's affidavit (<u>see</u> Docket Entry 53-2), completely fails to connect Nurse Ferguson to Plaintiff's medical care on January 22, 2016. Without any competent evidence regarding what role, if any, Nurse Ferguson played in Plaintiff's contested medical care, the

_____

18  In this regard, it bears emphasis that Nurse Sullivan avers that, "[w]hen [Plaintiff] appeared before [her], he had already been decontaminated." (Docket Entry 53-2, ¶ 5.) Thus, although Plaintiff asserts that officers failed to decontaminate him after pepper spraying (<u>see, e.g.,</u> Docket Entry 22 at 15-16), any claim that Plaintiff pursues against Nurse Sullivan regarding decontamination falters on the "subjective" prong of the deliberate indifference claim. Put simply, even if the officers had not in fact decontaminated him, Plaintiff has not shown that Nurse Sullivan "<u>actually kn[e]w of</u> and disregard[ed]," <u>De'lonta</u>, 708 F.3d at 525 (internal quotation marks omitted) (emphasis added), this failure and the risk that it posed to him.

52

record fails to support Plaintiff's claim that Nurse Ferguson acted with deliberate indifference in responding to Plaintiff's post-altercation medical needs. See, e.g., Iko, 535 F.3d at 241 (explaining that subjective component of deliberate indifference claim requires both "*actual knowledge of the risk of harm* to the inmate" and "*also*" official's "recogni[tion] that *h[er] actions were insufficient* to mitigate the risk of harm to the inmate arising from his medical needs" (emphasis in original) (internal quotation marks omitted)).

Therefore, the Court should grant Nurse Sullivan's and Nurse Ferguson's request for summary judgment.

## D. Excessive Force Claim

Finally, Defendants seek summary judgment on Plaintiff's excessive force claim against Sgt. Johnston, as "blatantly contradicted by the record." (Docket Entry 53 at 20 (emphasis and all-cap font omitted).) This contention does not justify summary judgment in Sgt. Johnston's favor.

In support of this argument, Defendants first assert:

> Multiple courts have held that the use of a "bent-wrist" escort technique is not excessive force, especially when dealing with an uncooperative or combative inmate. *See Robinson v. Fenner*, 2021 WL 771753 at **6-7 (E.D. Va. Feb. 26, 2021); *Salahuddin v. Doute*, 2018 WL 9490342 (E.D. Va. Oct. 4, 2018); *Sears v. U.S.*, 2015 WL 4274680 at **3, 7 (E.D.N.C. July 14, 2015); *Miller v. Rieper*, 2013 WL 286261 at **2, 4 (E.D.N.C. Jan. 24, 2013); *Ramos v. Hicks*, 1988 WL 80176 at *2 (S.D.N.Y. July 25, 1988) ("the use of some force, whether a 'bent wrist comealong hold' or a single punch was not unreasonable or excessive under the circumstances where

53

[inmate] repeatedly ignored [officer's] orders, became agitated and attempted to damage state property").

> In this case, Plaintiff alleged that Sgt. Johnston and Ofc. Harrington "applied the escorted maneuver" on Plaintiff and "appl[ied] pressure to [Plaintiff's] arm." DE-22 at ¶¶ 22. Upon information and belief, Plaintiff may be referring to the bent-wrist technique, which is a NCDPS approved technique used to "gain compliance from handcuffed inmates." *Sears*, 2015 WL 4274680 at fn 1. While Plaintiff claims that he was not resisting or acting combatively, it was clear from the video that Plaintiff had just viciously assaulted two officers and it was necessary to control Plaintiff. Thus, even if Defendants did use the bent-wrist technique, they were justified in doing so because they needed to ensure the safety of themselves and others around them. Furthermore, Plaintiff never complained about any injuries to his hands, wrists, or fingers. **Exhibit 1E**. Therefore, even if Defendants used the bent-wrist technique, the Court should find that it was not excessive force.

(Docket Entry 53 at 20-21 (emphasis and brackets in original).) This argument misses the mark.

First, in their explanation of the "bent-wrist technique," Defendants omitted a vital portion of the Sears quotation: "The bent-wrist technique is a NCDPS[-]approved technique which is employed in order to gain compliance from handcuffed inmates who are resisting officers," Sears, 2015 WL 4274680, at *3 n.1 (emphasis added). Similarly, all of the decisions upon which Defendants rely for the proposition that application of the bent-wrist technique does not constitute excessive force involved inmates engaged in resistence or other forms of active non-compliance. See, e.g., Robinson, 2021 WL 771753, at *5 (officer applied bent-wrist technique during surprise attack by physically

54

larger, unrestrained inmate on isolated, smaller officer); Salahuddin, 2018 WL 9490342, at *2 (explaining that "the undisputed record establishes that force was not used until plaintiff purposely fell to his knees and refused to keep walking while being escorted to administrative segregation by Officer Ross" and that "Officer Ross grabbed plaintiff's neck and put pressure on plaintiff's wrists for the sole purpose of making plaintiff stand up and walk again"); Sears, 2015 WL 4274680, at *3 (explaining that inmate "attempted to resist . . . and pull his hands back into his cell," at which point one officer "maintained control of the handcuffs" while two officers "applied the bent-wrist technique to [inmate's] wrist[s]"); Rieper, 2013 WL 286261, at *2 ("Once in the decontamination area, plaintiff became unruly. Defendant Correll ordered plaintiff to calm down as he was flushing his eyes and face with water. When plaintiff was ordered to leave the decontamination area, he refused, requiring defendants Clark and Correll to take plaintiff's wrist in a bent wrist come along hold. Defendants Clark and Correll took plaintiff to the nurse's station in Unit 1 for a medical screening." (citations omitted)); Ramos, 1988 WL 80176, at *2 ("There is no dispute that Mr. Ramos 'got very upset' when Officer Hicks disconnected the telephone and that Mr. Ramos 'tried to rip the telephone off the wall.' The use of some force, whether a 'bent wrist comealong hold' or a single punch was not unreasonable or excessive under the circumstances where Mr.

Ramos repeatedly ignored Officer Hicks' orders, became agitated and attempted to damage state property which the defendant had an obligation to protect." (citation omitted)).

Here, however, taking the evidence in the light most favorable to him, Plaintiff had submitted to handcuffs prior to Sgt. Johnston taking custody of Plaintiff (Docket Entry 22 at 9-10) and engaged in "no resistence []or combative behavior" during Sgt. Johnston's escort to Receiving (id. at 12). A material facutal dispute also remains as to whether Sgt. Johnston applied only the force necessary to maintain control of Plaintiff (even assuming Plaintiff's recent assault on two correctional officers warranted increased control notwithstanding Plaintiff's submission to handcuffs and (at least temporary) cessation of combative behavior). (See, e.g., id. at 11-12 (averring that Sgt. Johnston made comments evidencing intent to retaliate while applying pressure to Plaintiff's handcuffed arms).) Finally, the excessive force analysis does not hinge on whether or not Plaintiff "complained about any injuries to his hands, wrists, or fingers" (Docket Entry 53 at 21). See Dean, 984 F.3d at 303. Accordingly, the Court should reject Defendants' challenges to the escort-related aspects of Plaintiff's excessive force claim.[19]

---

19 Defendants do not assert that Sgt. Johnston applied only de minimis force in this encounter. (See Docket Entry 53 at 20-21.) In any event, Plaintiff averred that Sgt. Johnston applied sufficient force to "mak[e] it difficult for [Plaintiff] to walk
(continued...)

As for Plaintiff's allegations regarding Sgt. Johnston's assault in Receiving, Defendants contend (in full):

> There is not one shred of evidence to support Plaintiff's allegations that Sgt. Johnston assaulted Plaintiff. Instead, there are statements from four correctional staff members denying that Sgt. Johnston struck Plaintiff, and instead, claiming that it was Plaintiff who head-butted Sgt. Johnston. **Exhibit 1F** (statements of Sgt. Johnston, Ofc. Harrington, Ofc. Bullard, and Ofc. Haire); **Exhibit 3** at ¶ 3. As such, the record blatantly contradicts Plaintiff's statement. *See Scott*, 550 U.S. at 380.

(Docket Entry 53 at 22 (emphasis in original).)

Sgt. Johnston's affidavit and the officers' statements[20] in the Incident Report constitute precisely the type of "documentary evidence that lends support to a government official's account of events," Harris, 927 F.3d at 276 (internal quotation marks omitted), but fails to authorize rejection of "[P]laintiff's version of the facts," id. (internal quotation marks omitted). As the Fourth Circuit has explained, such affidavits "are a routine feature of excessive force cases, and they do not justify a departure from the normal summary judgment standard." Id. Accordingly, Defendants' Scott argument does not warrant summary judgment for Sgt. Johnston.

---

19(...continued)
adequately" (Docket Entry 22 at 12), establishing that Sgt. Johnston applied more than de minimis force.

20  The officers did not make these statements under oath or penalty of perjury. (See Docket Entry 53-1 at 58-61.)

57

Consideration of the <u>Whitley</u> factors does not counsel otherwise. As to the first factor, "the need for the application of force," <u>Iko</u>, 535 F.3d at 239 (internal quotation marks omitted), construed in the light most favorable to Plaintiff, the record reflects that Sgt. Johnston struck Plaintiff, a handcuffed and compliant inmate, in the eye with a foreign object. Although Plaintiff had previously assaulted two officers, by the time Sgt. Johnston struck him, Plaintiff had submitted to handcuffs and had ceased any resistence. As noted, "[t]he use of force must stop when the need for it to maintain or restore discipline no longer exists." <u>Thompson</u>, 878 F.3d at 105 (internal quotation marks omitted). This factor therefore weighs against Sgt. Johnston's position.

The second factor, "the relationship between the need and the amount of force that was used," <u>Iko</u>, 535 F.3d at 239 (internal quotation marks omitted), likewise favors Plaintiff. Here, Plaintiff asserts that Sgt. Johnston, in an unprovoked attack, hit him hard enough to break his orbital bones and render him unconscious. This evidence (if believed) "tend[s] to show that the amount of force used was disproportionate to the need for force." <u>Iko</u>, 535 F.3d at 240; <u>see also</u> <u>Cowart v. Erwin</u>, 837 F.3d 444, 453 (5th Cir. 2016) (explaining that, in excessive force case, "the extent of injury may supply insight as to the force applied").

58

The remaining factors, "the extent of any reasonably perceived threat that the application of force was intended to quell" and "any efforts made to temper the severity of a forceful response," Iko, 535 F.3d at 239 (internal quotation marks omitted), also tilt against summary judgment. Here, Plaintiff's evidence depicts an unprovoked attack, utilizing a foreign object, on a compliant, handcuffed individual, still compromised by pepper spray. The record further contains evidence from Plaintiff of a failure to ensure that he could, following the assault, decontaminate his injured eye and face, notwithstanding Plaintiff's plea that he "could not breathe" (Docket Entry 22 at 14). (See id. at 13-16.) Thus, the remaining Whitley factors also favor survival of Plaintiff's excessive force claim.

"All told," at this juncture in the proceedings, "these factors combine to provide an inference that [Sgt. Johnston] wantonly inflicted pain upon [Plaintiff by assaulting him while he remained subdued in handcuffs]." Iko, 535 F.3d at 240.[21] Sgt. Johnston contends, however, that qualified immunity shields him from Plaintiff's excessive force claims. (See Docket Entry 53 at 28-29.) The Court applies a two-step analysis to qualified

---

21 As previously noted, Plaintiff pursues solely an excessive force claim against Sgt. Johnston. (See, e.g., Docket Entry 22 at 27-34 (identifying assault as "the facts underlying [his] claim(s)," identifying eye damage and surgeries as "injuries related to the [challenged] events," and identifying as requested relief that he "would like compensation for his right eye [damage]").)

immunity defenses, asking "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the [correctional] officer's actions violated a constitutional right" and "whether the right at issue was 'clearly established' at the time of the officer's conduct." Harris, 927 F.3d at 279 (certain internal quotation marks omitted). For the reasons stated above, the facts, construed in the light most favorable to Plaintiff, would support a finding that Sgt. Johnston violated Plaintiff's eighth-amendment rights. Moreover, by 2016, clearly established law recognized that officers cannot use force against compliant inmates, even if an inmate had previously assaulted other officers. See, e.g., Dean, 984 F.3d at 310-11 (discussing cases on point dating back prior to 2015). Accordingly, qualified immunity does not shield Sgt. Johnston from Plaintiff's excessive force claim at the summary judgment stage.

## **CONCLUSION**

Plaintiff cannot pursue a claim for damages against Defendants in their official capacity under Section 1983. Plaintiff also failed to (i) exhaust administrative remedies on his claim against Unit Manager Ingram and (ii) come forward with evidence sufficient to sustain a claim that Nurse Sullivan and Nurse Ferguson acted with deliberate indifference to his serious medical needs. However, material factual disputes preclude summary judgment on Plaintiff's excessive force claim against Sgt. Johnston.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 52) be granted in part and denied in part as follows:  summary judgment should be entered on Plaintiff's official capacity claims and his individual-capacity claims against Unit Manager Ingram, Nurse Sullivan, and Nurse Ferguson, but summary judgment should be denied on Plaintiff's individual-capacity excessive force claim against Sgt. Johnston.

This 26th day of July, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
